IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| In re<br><br>Robert A. Campbell and Rebecca L. Campbell,<br><br><div align="right">Debtors.</div> | Chapter 7<br><br>Case No: 2:10-bk-26653-SSC<br><br>Adversary No.: 2:10-ap-01659-SSC |
| PMM Investments, LLC,<br><br><div align="right">Plaintiff,</div><br>v.<br><br>Robert A. Campbell and Rebecca L. Campbell, husband and wife,<br><br><div align="right">Defendants.</div> | MEMORANDUM DECISION |

## I. INTRODUCTION

PMM Investments, LLC, the Plaintiff, filed its Complaint commencing this action against the Debtors, Robert and Rebecca Campbell, on September 16, 2010. In the Complaint, the Plaintiff asserted four claims for relief against the Debtors under 11 U.S.C.§§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). The Debtors filed an Answer on September 28, 2010. The Court held

the trial over a number of days, commencing on January 31, 2012, and concluding on December 13, 2012.[1]  At the conclusion of the trial, the Court directed the parties to file simultaneous opening and responsive memoranda of law by January 25, 2013, with the matter being deemed under advisement at that time.

In this Memorandum Decision, the Court has set forth its findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.  The issues addressed herein constitute a core proceeding over which this Court has jurisdiction.  28 U.S.C. §§ 1334(b) and 157(b) (West 2012).

## II. FACTUAL BACKGROUND

In 2005, the Plaintiff, PMM Investments, LLC ("PMM") through its member, Mike Marsillo ("Marsillo") made a $1,000,000 capital contribution to Lone Mountain Landing, LLC  ("LML"), a company formed to develop a condominium project known as Bali Watergardens (the "Project"). Robert Campbell ("Campbell") and Steve Kurth ("Kurth") were the initial members of LML. In addition to PMM, New Horizons Villas, LLC ("NHV"), a Kurth entity, and JQC Development, LLC ("JQC") were to become members of LML. The members of JQC consisted of Robert and Rebecca Campbell, the Debtors herein.

On or about June 10, 2005, Marsillo and Kurth met to discuss an investment in the Project. The Project was to be built at 12th Street and Devonshire in Phoenix, Arizona. However, the real property was then owned by a third party, Sid Rosen or an entity controlled by him ("Rosen").  On July 14, 2005 SC Homes, a company owned by Kurth and JQC entered into

---

[1] The illness of Plaintiff's counsel and scheduling issues required that the trial be conducted over a number of days.  The days of the trial were January 31, February 1, April 24, September 20, and December 13, 2012.

2

a purchase agreement with Rosen, whereby SC Homes and JQC were to purchase the property located at 12th Street and Devonshire for $7,500,000.00.[2] However, this purchase agreement was amended, from time to time, by the parties.

The Restated and Amended Operating Agreement of LML ("Operating Agreement") was signed on September 7, 2005,[3] by Kurth, as Manager of NHV, Robert Campbell, the Debtor, as Manager of JQC, and Patti Marsillo, as Manager for PMM Investment.[4] The purpose of LML is set forth as:

> [LML] has been formed to own, manage, develop, lease, sell, hypothecate and otherwise deal with real property, and may engage in any activities suitable or proper for the accomplishment of this purpose or any purpose later established by the unanimous vote of its Members.[5]

The term of the Operating Agreement commenced upon execution of the Agreement, and did not terminate until all Members agreed in writing or until a Withdrawal Event occurred as defined under the Arizona Limited Liability Company Act.[6]

Pursuant to the Operating Agreement, membership in LML was conditioned on each member making an "Initial Capital Contribution" within the time period required by the Manager. The initial capital contribution of NHV and JQC consisted of the assignment to LML of the Addendum to Escrow Instructions and Real Property Purchase Agreement, dated July 14, 2005 ("Addendum"), whereby LML would have the right to purchase certain real property

---

[2]  See Exhibit 11.
[3]  See Exhibit 1.
[4]  See Exhibit 1, p. 24-25.
[5]  See Exhibit 1, Section 1.5 at p. 2.
[6]  See Exhibit 1, Sections 1.6, 1.9(a), 1.9(x), and 9.1, at pp. 2, 5, and 20. See A.R.S § 29-733 which sets forth a number of occurrences that qualify as an event of withdrawal, whereby a person ceases to be a member of a limited liability company.

3

located at 12th Street and Devonshire Street ( the "Property").[7]  However, the Addendum was not

the final agreement of the parties concerning the purchase of the Property.  Rosen and the other

parties to the Addendum continued to negotiate as to the terms of the purchase as set forth more

fully hereinafter.

        Acquiring the Property was important to LML to proceed with the operation of its

business.  For instance, numerous Kurth entities were required to be utilized by LML concerning

the construction of homes, providing architectural and interior design services, and the marketing

and sale of the homes on the Property.[8]  These provisions of the Operating Agreement were not

to be changed without the unanimous vote of all Members of LML entitled to vote.[9]  The facts

reflect that these provisions were never changed.

        Upon the initial capital contribution being made, NHV and JQC would each own

45% interest in LML.  The initial capital contribution of PMM was set forth as a cash

contribution of $1,000,000 made in full within five months from the date of the Agreement.[10]

Upon said contribution being made in full, PMM obtained a 10% interest in LML.  The

Operating Agreement required that the initial capital contribution of PMM be returned to PMM,

without interest, within two years of the date of the Agreement.  Even after the return of the

Contribution, PMM was to retain the 10% interest in LML.[11]

---

[7]  See Exhibit 1, Section 2.1.1 at p. 6.

[8]  See Exhibit 1, Sections 4.3.2, 4.3.3, 4.3.4, and 4.3.5 at pp. 13-14.
[9]  Id.
[10]  See Exhibit 1, Section 2.1.2 at p. 6.
[11]  See Exhibit 1, Section 2.5.1 at p. 7.

4

PMM made the initial capital contribution in five (5) monthly installments, with the first installment payment made on August 16, 2005 and the last on December 6, 2005.[12] According to the LML Operating Account Ledger regarding M&I Bank Account No. 33951225 the following payments were made:

| | |
|---|---|
| August 16, 2005 | $300,000 |
| September 9, 2005 | $150,000 |
| October 10, 2005 | $150,000 |
| November 10, 2005 | $200,000 |
| December 6, 2005 | $200,000[13] |

It does not appear that NHV or JQC ever formally assigned the Addendum or any purchase agreement to LML, as required by the Operating Agreement. Since their membership in LML was conditioned on their making a specific initial capital contribution, it does not appear that either entity ever became an official member of LML.

However, the Operating Agreement stated that the business and affairs of LML were to be managed exclusively by its Manager. The Manager was to "direct, manage and control the business of [LML] to the best of its ability" and had "full and complete authority, power and discretion to make any and all decisions and to do any and all things which the Manger shall deem to be reasonably required to accomplish the business and objectives of [LML]. No member other than a Manager [would] have the authority to act for or bind [LML]."[14] The Agreement provided that there could be more than one Manager for LML, yet the Agreement stated that if there was more than one manager, they would be referred to

---

[12] See Exhibit 2.
[13] Id.
[14] See Exhibit 1, Section 4.1 at p. 11.

5

collectively as "Manager" in the Agreement.[15]  According to the terms of the Operating

Agreement, Kurth and Campbell, not their entities, were the initial Managers of LML.[16] They

were to remain Managers until the next annual meeting of the Members or until a successor or

successors were elected and qualified.[17]  The evidence reflects that Kurth and Campbell served

as the Managers of LML, and that no one succeeded them.

 Pursuant to the Operating Agreement, the Manager(s), in the furtherance of the

business objectives of LML, were authorized to perform a number of functions, including:

> …[E]xecute on behalf of the Company all instruments and documents  including,
> without limitation, checks, drafts, notes, and other negotiable instruments;
> mortgages or  deeds of trusts; security agreements, financing statements;
> documents providing for the acquisition, mortgage or disposition of the
> Company's property; assignments; bills of sale; leases; partnership agreements;
> and any other instruments or documents necessary, in the opinion of the Manager,
> to do business of the Company. When there is more than one Manager of the
> Company, the signature of each Manager shall be required on the above-
> referenced instruments and documents.[18]

 Soon after the deposit of PMM's initial capital contribution, Kurth  began

withdrawing nearly all of the funds in a series of transactions. The funds were transferred to

Kurth and various related business entities.

 During the spring of 2006, Marsillo was informed that the Project was no longer

viable. In lieu of returning the initial capital contribution, Kurth and Campbell sought to have

PMM invest in two other projects: one was on 44th Street and McDowell and the other one was

located at Union Hills and 14th Street. Marsillo declined the offers and requested the return of

---

[15] See Exhibit 1, Section 4.2 at p. 11.
[16] See Exhibit 1, Section 4.2 at p. 11.
[17] See Exhibit 1, Section 4.2 at p. 11.
[18] See Exhibit 1, Section 4.3.1(i) at p. 12-13.

6

PMM's $1,000,000. On or about November 2006, PMM received $250,000.00 as a partial return of its investment.

Steven Kurth filed a petition for relief under Chapter 7 of the Bankruptcy Code on July 2, 2009.[19] PMM commenced an adversary proceeding on August 20, 2009 seeking to have its debt of $1,000,000 be excepted from discharge. Summary judgment was entered against Kurth in the sum of $1,050,000.[20]

The Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code on August 23, 2010.

On January 31, 2012, Rosen, an Arizona attorney for many years, testified at the trial as to his involvement with the Project. He owned the Property at 4323 N. 12th Street, Phoenix, AZ, previously described as the 12th Street and Devonshire property. Through an acquaintance, Rosen first met Campbell in January or February 2005. He talked to Campbell about creating an exotic water garden, similar to what he had found in Bali, Indonesia, in Phoenix, Arizona. The Project was to be a show place for the arts and culture of Indonesia. Rosen described the project as "a high-end condo project." Both Campbell and Kurth, excited about the Project, traveled to Indonesia to get a better understanding of how the Project would be created. Rosen agreed to sell the Property for the Project to Campbell and Kurth, or their entities.

At the trial, Rosen focused on the purchase agreement, the Addendum, stating that while Campbell and Kurth were responsible for the drafting of the Addendum, Rosen did engage

---

[19] See Case No. 2:09-bk-15251-RTBP.
[20] See Case No. 2:09-ap-00961-RTBP; Docket Entry No. 48. At trial, Kurth conceded that a nondischargeability judgment had been entered against him in the amount of at least $750,000.

7

in extensive editing of the various drafts.[21]  Rosen stated that he had inserted the initial purchase price for the Property of $7,500,000.[22]  The Addendum provided that Rosen, as seller, would receive a 40 percent "limited partnership" interest in the "net profit of the entire development."[23]  Campbell executed the Addendum on behalf of JQC Development Company. [24]

The Addendum provided for a closing date of March 8, 2006.[25] The Campbell and Kurth entities could extend the closing date, but they had to pay additional consideration to do so.[26]  The parties anticipated that prior to the close of escrow, the Campbell and Kurth entities would commence construction on the Property, incurring certain out-of-pocket expenses, such as preparing financial projections, putting together proposals for financing, conducting surveys, conducting marketing studies, preparing feasibility studies, obtaining final site plan approval, and obtaining final appraisals for the building plans, including filing the blueprints for the Project.[27]  According to the Addendum, Campbell and Kurth estimated that the aforesaid costs, or entitlements for the Project, might cost as much as $200,000 to $300,000. [28]

As the closing approached, Rosen became concerned that little or no work had been done on the Project. He asked the parties for information about investors, and generally what had been done on the Project.  Rosen stated that he received little if any information to his repeated inquiries.

---

[21] Exhibit 11.
[22] See Exhibit 11, ¶3 at p. 3.
[23] See Exhibit 11, ¶3 at p. 3.
[24] See Exhibit 11 at p. 18.
[25] Id., ¶4 at p. 4.
[26] Id., ¶7.1 at p. 6.
[27] Id., ¶s 6.3 and 24 at pp. 6 and 18.
[28] Id., ¶24 at p. 18.

8

Rosen testified that the Project, and the closing concerning the Property, had been delayed by the parties' inability to finalize an operating agreement for the Project. Rosen stated that such an agreement was required, since his interest in the Project depended on the net profits to be received in the future. Subsequently, Rosen was presented with the operating agreement for the 12th Street Development Investors LLC that related to the Project.[29] Rosen stated he was livid upon a review of the agreement. He felt that he had been defrauded. For instance, one paragraph provided that additional members could be added as and when additional capital was required.[30] However, if additional members were added, it would dilute Rosen's interest in the limited partnership. In fact, the agreement provided an example. If an additional member contributed capital sufficient for a 10 percent interest in the limited partnership, Rosen's interest of 40 percent would be diluted to 36 percent, and the interest of LML would be diluted from 60 percent to 54 percent.[31] Rosen stated that this requirement of additional members providing additional capital was "contrary to every discussion" that he had had with Campbell and Kruth on the Project. Moreover, Campbell wanted to have the Property transferred to LML, then assigned to 12th Street Development. Rosen rejected this proposal, since he had no interest in LML.

The parties continued with their discussions concerning the Project. More drafts of the 12th Street Development Investors Operating Agreement were prepared. By November 21, 2005, they were still working on the agreement. [32] Any requirement of an additional capital contribution by Rosen had been eliminated. Moreover, the agreement also provided that Rosen

---

[29] See Exhibit 3.
[30] See Exhibit 3, ¶2.1.2 at p. 6. Also see ¶ 2.2.1 at p. 6, that provided for the infusion of additional capital.
[31] Id.
[32] See Exhibit 4.

9

was no longer financially responsible, on a pro rata basis, if Campbell was unable to raise the money for the Project.[33] The agreement now provided that Campbell and Kurth would be the initial managers of 12th Street Development.[34]

By January 17, 2006, the parties were still attempting to finalize the 12th Street Development Investors Operating Agreement.[35] Rosen stated he drafted this version of the agreement, tired of the on-going dispute with the parties. Part of the disagreement focused on the sales price of the Property from Rosen to the Campbell and Kurth entities. Given the market, Rosen believed the Property had increased in value from $7.5 million to $12.5 million. The parties were unable to finalize the terms, and this agreement was never executed. The parties were never able to close escrow on the Property.

Of importance to the Court is Rosen's testimony that Campbell was to obtain the financing for the Project. Rosen's father had advised Campbell of a contact at the National Bank of Arizona. However, Rosen stated that Campbell never met with the contact. When Rosen inquired, from time to time, as to what progress Campbell had made in obtaining financing for the Project, he would receive no concrete information. Rosen stated that the foregoing reflected Campbell's lack of good faith.

The Court concludes that Rosen was a credible witness. He testified as to a lack of information and a lack of progress concerning the purchase of the Property and the realization of the Project. His testimony reflects that Campbell was the financial person on the Project, yet

---

[33] Id., ¶2.1 at pp. 5-6.
[34] Id., ¶4.3.5 at p. 15. Rosen, in his individual capacity or as trustee, was no longer a member. Rosen had substituted an entity, Bali Watergardens on 12th LLC, in his place.
[35] See Exhibit 5.

10

Campbell showed no real interest or ability in obtaining financing for the Project. The Court concludes that Rosen's testimony reflects circumstances indicating fraud by Campbell.

On January 31 and February 1, 2012, Kurth also testified at the trial. He stated that he had been a general contractor for 10 to 15 years, and that he was then remodeling or renovating residential properties for the purpose of resale. He initially was engaged in the new construction of apartments, condominiums, and townhomes. However, after 2006, the market became an issue, and he had to switch to remodels and renovations. For the Project, he was responsible for the design, build and development. Kurth stated that Bali Watergardens was the largest project on which he had ever worked.

He stated that he and his wife were initially to participate in the Project, with one of their entities, New Horizon Villas, having an interest in LML. He had created LML previously as a vehicle for future projects, but it was a "shelf company," or a company that had been created with no operations, at the time of the initial negotiations for the Project. Kurth decided to use LML as the vehicle that he, Campbell, and their respective spouses would utilize for the development of the Project. LML was also to be the vehicle to obtain additional members and capital for the Project.

He and Campbell started the Bali Watergarden Project in 2005. They had previously worked on one or more projects together. Kurth described himself as the "construction guy," while Campbell was the "finance guy." He testified that Campbell was to obtain any financing for the Project.

In June 2005, Kurth met Marsillo, who was being treated by Kurth's wife, a physical therapist. He told Marsillo about the Project and that he was looking for "seed money"

11

in the amount of $1,000,000. There was no agreement as to any type of investment at the end of their first meeting. Kurth did not recall much about any subsequent meetings, such as the dates, places, or times of the meetings. He only remembered that at some point, he provided Marsillo with the Operating Agreement for LML, after Marsillo had expressed interest in the Project. Kurth conceded that most, but not all, of the meetings concerning PMM"s investment were between him and Marsillo. He also conceded that Campbell was certainly at one or more of the meetings at which the parties were negotiating. He did think that he met with Marsillo out at the Property to describe the Project in more detail. Kurth stated that PMM's investment in the Project was always set at $1,000,000.

The attorney for Campbell and Kurth, Marvin Davis, drafted the Operating Agreement. Kurth was not familiar with the Operating Agreement, but he conceded that he or one of his entities was required to assign his/its interest in the Property as a capital contribution to LML. Kurth was certain that Marsillo, Campbell, and he would have talked about the Operating Agreement before any one of them signed the Agreement. However, he was unsure how many meetings occurred at which the three of them were present. Ultimately the Operating Agreement was executed by all parties, the PMM investment was accepted jointly by Campbell and Kurth, and the capital contribution was paid by PMM, over time, and placed in the LML deposit account. As noted previously, the Operating Agreement required that Campbell and Kurth execute any checks concerning the LML deposit account.

Kurth was not credible on certain points. For instance, he would recall little, if anything, as to the substance of the meetings that he had with Marsillo or the meetings with Marsillo, Campbell and himself concerning PMM's investment, but he was sure that he would

12

have told Marsillo that Rosen was also to be a limited partner in the entity that would ultimately operate the Project. He was also sure that he had advised Marsillo that rather than having a 10 percent interest in LML, PMM would have a 10 percent interest in LML that would have a 60 percent interest in an entity to be created. These statements lack credibility. Particularly in light of Kurth's inability to remember details of the transactions concerning the purchase of the Property, the assignment of the Property, and PMM's investment.

Kurth also did not advise Marsillo of the purchase of the office building located at 4222 N. 12th Street in Phoenix, Arizona, although Kurth intended to use the building as the base of operations for the salespeople for the Project and had utilized funds deposited by PMM for the purchase of the building. When Kurth was asked to review the LML Operating Agreement at trial, he realized, and so testified, that the purchase of the office building would have required an affirmative vote of all the members and that no such vote had occurred.[36]

Of critical importance to the Court is Campbell's involvement and understanding of the negotiations with Rosen and Marsillo. Although Campbell attempted to distance himself from the negotiations with Marsillo, stating that Marsillo was Kurth's investor and that Kurth provided all of the information that an investor would require, Campbell was not credible. Both Marsillo and Kurth testified that Campbell was involved in the negotiations with Marsillo, particularly when it involved the financing or operations of the Project. Even Campbell conceded that he was the one who conducted the primary negotiations with Rosen as to the

---

[36] See Exhibit 11, ¶4.3 at p. 11. Arguably PMM would have been the only member entitled to vote on the purchase of the office building. Since the Property was never assigned by Kurth, Campbell, or their entities, to LML, they were not members. However, Kurth and Campbell were Managers of LML, from the time of the execution of the Operating Agreement, so they would have had an affirmative duty to notify PMM, through Marsillo, what they intended to do and get PMM's approval of the office building purchase.

13

acquisition of the Property. Campbell was also the person who understood finance and was able to understand the multiple and conflicting promises that he was making to Rosen and Marsillo. For instance, pursuant to the LML Operating Agreement, Campbell knew that his entity would have a 45 percent interest, Kurth's entity would have a 45 percent interest, and PMM would have a 10 percent interest in LML. He also knew that LML could not effectively operate unless he, as the primary negotiator for the purchase of the Property, ensured that the Property was purchased from Rosen. He also knew that Rosen wanted an interest in the Project before Rosen would sell the Property to LML or to any other entity controlled by Campbell and Kurth. In essence, Campbell held the keys to ensuring that the Project was a reality. When he could not close the transaction with Rosen, he should have notified Marsillo and immediately returned the investment to PMM. He did neither.

Campbell also knew that he was negotiating two separate transactions that posed a dilution of the interests of both Rosen and PMM. As Rosen testified, the 12th Street Development Investors, LLC provided that Rosen's or his entity's interest could be diluted from 40 percent to 36 percent if an additional investor were obtained. Campbell also knew, since he had executed the LML Operating Agreement, that PMM only had a 10 percent interest in LML and that said interest would be diluted from 10 percent to 6 percent, if LML became a member of 12th Street Development and only 12th Street Development held title to the Property.[37] However, Campbell provided no disclosure of this information to anyone.

The facts reflect that soon after the funds were deposited into the LML deposit account, Kurth engaged in a series of self-dealing withdrawals. Some of the funds went to short

---

[37] 10 percent of a 60 percent is 6 percent.

14

term loans designated for him.  Other funds went to his other business ventures. The most

significant transactions occurred during the five- (5-) month period that PMM was making its

initial capital contributions. Notably, a $68,100 payment was made to JQC, an entity controlled

by Robert and Rebecca Campbell, on September 12, 2005.  The subject transactions include, but

are not limited to the following:

| Date | Recipient | Amount |
|------|-----------|--------|
| 8/12/2005 | SC Homes | $100,000 |
| 9/2/2005 | Steven's Custom, Inc. | $   6,000 |
| 9/12/2005 | JQC | $ 68,100 |
| 9/29/2005 | Kurth | $ 80,000 |
| 10/13/2005 | Kurth | $120,000 |
| 11/14/2005 | Kurth | $190,000 |
| 12/14/2005 | Kurth | $100,000 |
| 12/15/2005 | Kurth | $100,000 |
| 3/14/2006 | New Horizon Villas | $ 30,000 |
| 3/15/2006 | SC Homes | $ 13,000 |
| 3/17/2006 | Kurth | $  2,500 |
| 6/8/2006 | Steven's Custom | $  6,000 |
| 7/6/2006 | Steven's Custom | $  6,133 |
| 7/6/2006 | Steven's Custom | $ 10,000 |
| 7/19/2006 | Kurth | $  3,000 |
| 8/22/2006 | SC Home  Design | $  3,600 |
| 10/3/2006 | Steven's Custom | $ 15,957 |
| 10/3/2006 | Steven's Custom | $ 86,099 |
| 10/3/2006 | SC Home Design | $ 11,413 |
| 10/17/2006 | SC Home Design | $ 20,000 |

The transactions also exhibit a troubling pattern.  On August 6, 2005, the LML

account had a negative balance of $99,218.74.  On August 16, 2005, PMM, through Marsillo,

made a capital contribution of $300,000.00.[38]  On September 2, 2005, the LML account only had

a balance of $3,394.44, yet on the same date, PMM, through Marsillo, made a capital

---

[38]   See Exhibit 2.

15

contribution of $150,000.00.[39]  On October 4, 2005, the LML account only had a balance of

$2,502.12, yet on October 10, 2005, PMM, through Marsillo, made a capital contribution of

$150,000.00.[40]  On October 26, 2005, the LML account had a balance of only $606.06, yet on

November 10, 2005, PMM, through Marsillo, made a capital contribution of $200,000.00.[41]  On

December 6, 2005, the LML account had a balance of $1,103.34, yet on the same day, PMM,

through Marsillo, made a capital contribution of $200,000.00.[42]  Thus, PMM's capital

contributions were used to replenish the account of LML, and the funds were transferred to the

entities controlled by the Campbells (JQC) and Kurth (SC Home Design, Steven's Custom

Homes, or New Horizon Villas) or Kurth directly.

       Campbell testified that he had no access to the LML account in the fall of 2005

and that Kurth kept the checkbooks in his sole possession.  First, Campbell lacks credibility on

these points.  Moreover, as a Co-Manager of LML, it was Campbell's responsibility, pursuant to

the Operating Agreement, to have access to the account.

       The evidence does not support the testimony of the former controller as to how

the funds in the LML account were being deposited or expended.  Jonni DeAnda ("De Anda")

was hired as a controller in early 2006 for an associated entity, Visions West. DeAnda also did

the books for LML.[43]  According to DeAnda, when Campbell was notified of the diversion of

funds, Kurth's access to the LML account, as well as other shared accounts was cut off.

However, the evidence reflects otherwise.  The record reflects that Kurth continued to sign and

---

[39] Id.
[40] Id.
[41] Id.
[42] Id.
[43] DeAnda prepared the LML Operating Account Ledge regarding M & I
Account No. 33951225.

16

receive checks, from the LML account, without Campbell's signature.  As illustrated above, substantial amounts of money were being paid or transferred to Kurth, and his entities, even after Campbell was allegedly aware of Kurth's misappropriation.[44]  Thus, the continued use of the LML account by Kurth for purposes other than the Project, coupled with Campbell's duty of being Manager of LML, reflect Campbell's complicity in the misappropriation.

## III. DISCUSSION

In the Complaint, PMM asserted four claims for relief against the Debtor under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). PMM contends that Campbell, as a manager of LML, failed to abide by the terms of LML's Restated and Amended Operating Agreement, and failed to disclose material information to PMM regarding the acquisition of the property on which the Project was to be developed. Furthermore, PMM alleges that Campbell misappropriated all or part of PMM's $1,000,000 initial capital contribution. PMM did not pursue the claims for fraud in a fiduciary capacity under 11 U.S.C. § 523(a)(4), or willful and malicious injury under 11 U.S.C. § 523(a)(6). Therefore, the Court will only determine if the underlying debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) and/or 11 U.S.C. §523 (a)(4) for embezzlement.  The Court will review each ground, seriatim, to determine whether relief should be granted.

### A. DISCHARGE OF DEBT UNDER § 523(a)(2)(A)

Pursuant to 11 U.S.C. § 523(a)(2)(A), a monetary debt is nondischargeable "to the extent obtained by false pretenses, a false representation, or actual fraud."  In the Ninth Circuit,

---

[44] See Exhibit 18.

17

to prove nondischargeablity under § 523(a)(2)(A), the Plaintiff needs to show "(1) that the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representations; and (5) that the creditor sustained alleged loss and damage as the proximate result of such representations." In re Sabban, 600 F.3d 1219, 1222 (9th Cir. 2010); In re Diamond, 285 F.3d 822, 827 (9th Cir. 2002). The Plaintiff must establish the nondischargeability of a debt by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 284, 111 S.Ct. 654 (1991); In re Stern, 345 F.3d 1036 (9th Cir. 2003).

For a debt to be excepted from discharge, the debtor must actually intend to defraud the creditor. In re Tsurukawa, 258 B.R. 192, 198 (9th Cir. BAP 2001). However, direct evidence of an intent to deceive is rarely shown. Hence, intent may be "inferred and established from the surrounding circumstances." In re Hutquist, 101 B.R. 180 (9th Cir. BAP 2001); In re Anastas, 94 F.3d 1280, 1285 (9th Cir. 1996); In re Dakota, 284 B.R. 711, 721 (Bankr. N.D. Cal. 2002). The court must consider whether the totality of the circumstances paints a picture of deceptive conduct by the debtor that indicates an intent to deceive the creditor. In re Basham, 106 B.R. 453, 457 (Bankr. E.D. Va. 1989). Because no single objective factor is dispositive, the assessment of intent is, thus, left to the fact-finder. In re Jacks, 266 B.R. 728, 742 (9th Cir. BAP 2001). The intent to defraud a creditor is a finding of fact. In re Rubin, 875 F.2d 755, 759 (9th Cir. 1989).

PMM asserts that Campbell affirmatively represented that PMM's initial capital contribution was to be used solely for the development of the Project. Furthermore, PMM alleges that Campbell failed to disclose information to PMM that was material to its decision to invest,

and continue investing in LML. Specifically, PMM argues that Campbell was aware that the Addendum for the purchase of the property was not enforceable and required an additional agreement before the property could be purchased. According to PMM, Campbell knew that negotiations with Rosen were not going as planned, and failed to advise PMM of this essential fact, even as PMM continued to make its contributions.

No doubt the facts of this case are troubling. Although neither Marsillo nor Campbell were clear as to when and where they met, concerning the LML investment, the evidence reflected that they did meet on several occasions. They also both executed the Operating Agreement for LML, through their respective entities. As noted previously, Campbell was involved in negotiations with Rosen, so Campbell had critical information as to whether the Property would ever be acquired. Campbell knew that if the Property were not assigned to LML, the Project could not proceed. Campbell knew that Rosen required an interest in any entity that would acquire the Property. This required that PMM's interest in LML ultimately be diluted for the reasons explained in the factual discussion. Campbell disclosed none of this critical information to Marsillo. As noted previously, the evidence reflects that Campbell withheld this information from Marsillo, even as PMM continued to make capital contributions to LML. Thus, Campbell made false representations, or withheld information that would have been critical to PMM, and Campbell knew at the time that the representations were false or that he was withholding critical information from PMM that would have been relied on by PMM in determining whether to make or continue to make the LML investment. Factors 1 and 2 of the test have been met. Next, PMM, not being involved in the negotiations with Rosen, would have justifiably relied on the representations made by Campbell or would have justifiably relied on the

19

limited information provided by Campbell, in making or continuing to make the investment in

PMM. Factor 4 has been met.

However, as to factor 3, the Plaintiff failed to present sufficient evidence demonstrating that Campbell made the false representations or omitted to disclose information with the intent to defraud. The problem is that although Campbell was withholding information that should have been disclosed, the Court cannot find that Campbell intended to defraud PMM. Given the market conditions at the time, which allowed Rosen to increase the purchase price of the Property from $7,500,000 to $12,500,000, Campbell might have believed that he would ultimately be able to accommodate the interests of both Rosen and Marsillo.

The Court is also unconvinced that PMM has presented sufficient evidence in support of Factor 5. Returning to the market conditions at the time, it is unclear whether the loss sustained by PMM was proximately caused by the false representations or withholding of information by Campbell. Certainly some loss or damage may have occurred, but the Court is unable to quantify that loss or damage based upon the evidence presented. Therefore, the Court must deny the claim for relief under Section 523(a)(2)(A).

B. DISCHARGE UNDER § 523(a)(4)

Embezzlement in the context of nondischargeability has often been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." Moore v. United States, 160 U.S. 268, 269 (1885). Thus, for nondischargeability purposes under Section 523(a)(4), embezzlement requires three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating

20

fraud. In re Wada, 210 B.R. 572 (9th Cir. 1997); In re Littleton, 942 F.2d 551 (9th Cir. 1991); "Circumstances indicating fraud" can be situations where the debtor intended to conceal the misappropriation. In re Hatch, 465 B.R. 479 (Bankr. W.D. Mich. 2012). Embezzlement does not require the existence of a fiduciary relationship. In re Wada, 210 B.R. 572 (9th Cir. 1997).

The Plaintiff has set forth a sufficient basis under an embezzlement theory to be accorded relief. PMM contributed $1,000,000 in an initial capital contribution during the course of five months, beginning in August 2005 and ending in December 2005.[45] Pursuant to the Operating Agreement, the parties contemplated that Kurth and Campbell would acquire the Property from Rosen. In turn, Marsillo was advised that PMM's Initial Capital Contribution would be used to develop the Project in Phoenix, Arizona. The facts reflect that PMM anticipated the funds were to be used solely for the development of the Project by LML. Campbell and Kurth were the designated Managers of LML. The initial capital contribution was entrusted to LML, and Campbell, as a Manager, to be used to finance the Project. The funds were deposited into LML's M & I Bank Account No. 33951225, over which Campbell as a Manager had complete control. Campbell's statements that he did not have control over the Account were not credible. Thus, the first prong of the test has been met.

Pursuant to the Operating Agreement, both Managers, Kurth and Campbell, were required to execute, on behalf of LML, any checks, drafts, notes, or other instruments.[46] According to Marsillo, this provision was specifically added at the suggestion of his legal counsel to prevent one Manager from fraudulently or improperly depleting the funds of LML.

---

[45] See Exhibit 2.
[46] See Exhibit 1, Section 4.3.1(i) at p. 12-13.

21

However, it does not appear that any of the checks were signed by both Managers.[47]  The failure

of Campbell to execute any of the checks allowed Kurth to use the Account for his personal use

or to pay expenses, including payments to one or more of Campbell's entities, that were not

associated with the Project.  PMM had entrusted the funds in the Account to Campbell to ensure

that the funds would be expended only on the Project.  That did not occur.  The evidence reflects

a misappropriation of property, with the complicity of Campbell, for a purpose other than which

the funds were entrusted.  Normally one would expect the funds to be entrusted to one individual

and to have that individual misappropriate the funds.  In this case, although Campbell received

arguably only $68,100 through JQC, the entity of him and his wife, he was required as the

Manager of LML to co-sign every check on the account.  Thus, he was a part of the

misappropriation of funds as if he had improperly executed the checks.  The Court concludes that

given the unique facts of this case, the second prong has been met.

As to the third prong,  it is clear to the Court that the circumstances indicate fraud.

Specifically, the Court finds that even after Campbell became aware of the diversion of the funds

by Kurth, this information was concealed from PMM. Campbell's failure to provide financial

information to Marsillo, even after repeated requests, further indicates an intent to conceal the

misappropriation. Campbell's failure to comply with his duties as a Manager of LML, as set

forth in the Operating Agreement, also leads this Court to conclude that Campbell was engaged

in activity indicating fraud  As a Co-Manager, Campbell was equally responsible for the

operations and management of  LML.  This dereliction of duty by Campbell, and the total

disregard of the fraudulent behavior that had been perpetuated upon LML is of great concern to

---

[47]  See Exhibit 18.

the Court. Therefore, the Court concludes that facts of this case illustrate circumstances indicating fraud. Accordingly, the third prong of the test has been met.

Finally, the Court concludes that although Campbell was the Manager of LML on behalf of the marital community, JQC Development was an entity controlled by him and his wife, and JQC received at least one improper payment in the amount of $68,100, the misappropriation of funds are the actions of only Mr. Campbell. There is enough evidence, given the involvement of an entity controlled by both Debtors, to hold the community property of the Debtors, and the sole and separate property of Mr. Campbell, liable for the community debt arising as a result of this decision. Tsurukawa v. Nikon Precision (In re Tsurukawa), 287 B.R. 515, 519 (9th Cir. BAP 2002); In re Rollinson, 322 B.R. 879 (Bankr. D.Ariz. 2005). However, there is no indication that the actions of Ms. Campbell are such that her sole and separate property should be liable for the PMM obligation.

IV. CONCLUSION

Based upon the foregoing, the Court concludes that Mr. Campbell and the community property of the Debtors shall be liable to PMM in an amount to be determined later under Section 523(a)(4) as a result of the embezzlement by Mr. Campbell of funds invested by PMM Investments, LLC. Although PMM obtained a judgment against Steven Kurth, there may have been payments by Kurth that would have reduced the amount of the liability. The Court understands that the PMM investment was $1,000,000; however, the parties may be able to complete the accounting that now reflects, with appropriate setoffs, what is currently due and owing on the obligation. The Court denies any relief to the Plaintiff under Section 523(a)(2)(A). The Court shall execute a separate order incorporating this Memorandum Decision.

23

DATED this 31st day of March, 2013.

_____

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

24